S. J. BIFANO et ux., Appellants,

v.

ECONO BUILDERS, INC., et al., Appellees.

No. 16634.

Court of Civil Appeals of Texas.

Dallas.

Jan. 28, 1966.

Rehearing Denied March 4, 1966.

Strasburger, Price, Kelton, Miller & Martin, Robert H. Thomas, Dallas, for appellants.

William A. McKenzie, Dallas, for appellees.

BATEMAN, Justice.

The appellants S. J. Bifano and wife sued Econo Builders, Inc., H. Leslie Hill and Gardens Development Company for actual and exemplary damages because of the alleged breach of a lease of certain business property in the City of Dallas. The trial court instructed a verdict in favor of Econo Builders, Inc. and H. Leslie Hill and submitted the case to the jury on special issues as to the defendant

Gardens Development Company. The court rendered judgment in favor of Gardens Development Company on the verdict, decreeing that appellants take nothing as to any of the defendants. Appellants present thirty-three points of error on appeal.

### Facts

The appellee Hill owned several acres of land abutting Northwest Highway near its intersection with Lemmon Avenue in the City of Dallas, and began the development of a suburban shopping center to be known as Walnut Hill Shopping Center. The portion of the property adjacent to Northwest Highway was divided into three tracts lettered A, B and C. We are concerned here only with Tract C, consisting of 7,051 square feet in an irregular shape. In 1950 Hill leased Tract C to A. T. Bifano and appellant S. J. Bifano. This lease, which we shall speak of as the 1950 lease, explicitly covered all of Tract C, describing it by metes and bounds. The lessor was obligated to construct a building thereon for the lessees with approximate dimensions of 36′ x 86′ x 8′ x 47′ x 42′, to be occupied as a cafe. The term of lease was ten years beginning January 1, 1951, the rental being $410 per month plus a percentage of gross sales.

In either 1953 or 1954 A. T. Bifano acquired S. J. Bifano's interest in the restaurant, which was known as The Chef, and in October 1958 he asked Hill to renew the lease for another ten years. Hill wrote a note to his employee who typed the new lease, as follows:

"10/15/58

"Renew this lease for another 10 years from December 31, 1960 for $465.00 per month with the same percentage.
/s/ Hill."

Hill testified that this note referred to the original 1950 lease. The new lease, which we shall call the 1958 lease, covered the ten-year period to begin on January 1,

1961, and Econo Builders, Inc., which had in the meantime become the owner of the property, was named as lessor and only A. T. Bifano as lessee.

Before the 1958 lease could go into effect, it was rewritten in 1960, in terms identical with those of the 1958 lease except that both A. T. and S. J. Bifano were named as lessees. It was backdated to October 17, 1958 (the date of the 1958 lease) and will be called herein the 1960 lease. S. J. Bifano was named as one of the lessees because he had purchased A. T. Bifano's interest in The Chef.

In both the 1958 and 1960 leases the property covered was described as follows:

"a building approximately 36′ x 86′ x 8′ x 47′ x 42′ located in Tract No. C, consisting of 7,051 square feet (.162 acres, fronting towards Northwest Highway, near the new Lemmon Avenue."

The 1958 and 1960 leases also provided for a monthly rental of $465 plus a percentage of gross sales. All three leases contained the following printed clause:

"(16) Lessee acknowledges that the Lessor has reserved and retained the sole ownership and control of all walks, drives, *parking facilities* and *areaways* of the shopping center; and, Lessee agrees to abide by all of Lessor's regulations for the control of traffic, *parking,* cleanliness, and neat appearance of the whole shopping center and to secure observance thereof by his employees." (Italics ours.)

All three leases also contained the following typewritten provision:

"Lessee agrees that a strip 10 ft. wide adjoining the No. and N.E. boundary lines extending between the West and S.E. boundary lines, and a strip 25 ft. wide adjoining the south boundary line extending between the west and S.E. boundary lines *of leased premises* shall be used for vehicular traffic and Lessee agrees not to impede or block said traffic-ways or permit same to be im-

peded or blocked in any degree or manner." (Italics ours.)

The area comprising the second of the two "strips" mentioned in the last quoted paragraph was paved and used for parking automobiles, there being spaces thereon for the parking of nine vehicles, six in front and south of the restaurant and three on the east side of the building.

S. J. Bifano testified that when he went to Hill's office to sign the 1960 lease he noticed immediately the difference in the wording in the description of the property and asked Hill the reason therefor, to which Hill replied that one description was required by the lending agency, but that it was no longer required and that there were no differences in the leases. Hill testified that when the 1950 lease was executed Tract C abutted Marsh Lane on the East, but that the City later abandoned Marsh Lane and sold it to Hill, and that this property was contiguous to the east side of the Bifano lease.

All three leases contained a paragraph (19) providing that any increase in the ad valorem taxes assessed "on the demised premises" shall be borne one-half by lessor and one-half by lessee. Hill's bookkeeper testified, and it was stipulated, that appellants shared in the tax increase on all of Tract C and not just in the tax increase on the building. Hill testified that appellants were charged with the ad valorem taxes on all of Tract C and not simply the ad valorem taxes on the building, and that appellants were paying taxes on more than the demised premises if all they had under the lease was the building.

The building covered by the leases was one of several in a line and was on the corner. There was a sidewalk under the eaves of the building giving access from the central portion of the shopping center, and there was a planter box containing ornamental shrubbery on the east end of the building.

By July 5, 1962 the appellee Gardens Development Company had become the owner of the shopping center, and on that date, under its direction, construction of a new building was begun adjoining the building covered by these leases on the east end thereof. In connection with this work there were barricades in front of the restaurant; and the east wall, planter box and part of the roof on the east end of the building were destroyed and later repaired, and there was a great deal of dust and noise in connection with the tearing up of some of the paving in front of the property. The new building completely covered the three parking spaces to the east of the leased building. Both of the appellants testified at length to the great damage done to their business by all of this, explaining that the barricades made it difficult, if not impossible, for their customers to enter the restaurant and as to the loss of business due to the dust and noise, the diminution of the parking area and the fact that the restaurant was no longer on the corner.

Appellants contended that if the entire Tract C of 7,051 square feet was not actually included in the lease, nevertheless they were entitled to the beneficial use and enjoyment thereof because such was reasonably necessary to the occupation and use of the building. They alleged in the alternative that the lease was ambiguous and should be construed as including all of the 7,051 square feet or, alternatively, that the lease should be reformed to include the entire tract because of mutual mistake or, alternatively, that appellees fraudulently misrepresented the extent of the property covered by the 1958 and 1960 leases; also that appellees' conduct constituted a constructive eviction of appellants. The appellees contend that the last two leases were never intended to cover anything other than the building, that there is no ambiguity in the lease, and that there was no mutual mistake or misrepresentation. The contentions of the parties will be noticed in greater detail in the course of the opinion.

The findings of the jury were: (1) the conduct of Gardens Development Company, in causing construction to be carried on adjacent to the restaurant, was done with the intention on the part of the defendants that the plaintiffs should no longer use and enjoy the premises; (2) such construction substantially interfered with plaintiffs' use of the leased premises; (3) this interference was permanent; (4) the plaintiffs completely abandoned the leased premises within a reasonable time after such interference; (5) plaintiffs' abandonment of their leased premises was a direct consequence of the construction of the building adjacent to their restaurant; (6) the plaintiffs were actually deprived from a portion of the leased premises by the landlord, or by his authority; (8) the reasonable market value in Dallas County on September 1, 1962 of the leasehold estate held by plaintiffs was $465 per month; (9) the reasonable value of the furniture and fixtures sold by plaintiffs from the business in question on August 15, 1962 was $6,000; (10) the sum of $1.00 would reasonably compensate the plaintiffs for exemplary damages; and (11) S. J. Bifano did not fail to pay the stipulated rent under the 1960 lease from September 1, 1962 to date. The jury answered "None" to Issue No. 13 as to what would be a reasonable attorney's fee for enforcing or defending Gardens Development Company's rights or remedies under the 1960 lease; (14) that Gardens Development Company had not incurred any attorney's fees in enforcing or defending its rights or remedies under the 1960 lease; (15) any loss the plaintiffs might have sustained by reason of the construction of the adjacent building could have been compensated for in money damages without actual removal from their premises; and (16) Gardens Development Company, in constructing the building adjacent to the restaurant, used reasonable care to protect plaintiffs and their property from injury.

## Opinion

The first twenty-eight of appellants' points of error set forth in varying phraseology the basic contentions of appellants: viz., that they had been actually or, alternatively, constructively evicted from their leasehold by appellees, entitling them to actual and exemplary damages. Their position is that, although that portion of Tract C not covered by the building is not explicitly contained in the description of the property covered by the 1960 lease, it is nevertheless by implication a part of the demised premises, or should be considered so, because: (1) the use thereof by appellants was reasonably necessary to their beneficial use of the building itself; (2) they proved a right to have the lease reformed to include all of Tract C in that (a) it was omitted from the description by accident and mutual mistake, and (b) appellants were deluded into signing it by Hill's fraudulent representation that the 1950 and 1960 leases covered the same property; and (3) the 1960 lease is ambiguous and should be construed by the court to include all of Tract C.

■ We recognize the general rule that the lease of an entire building is a lease also of the ground under it, as well as adjacent land of the lessor which is used with the building as necessary to its proper occupation for the purpose for which it was intended. 51 C.J.S. Landlord and Tenant § 289, p. 944. However, we think appellants can take small comfort therefrom. Even under the 1950 lease, which described by metes and bounds the entire tract of 7,051 square feet as the leased premises, appellants had no right to appropriate the portion not covered by the building to their exclusive use, for the lease specifically provided that it should be used for vehicular traffic, that the lessor retained the sole control of it, and that the tenant agreed not to impede or block it in any way or permit it to be impeded or blocked, and to abide by all of the landlord's regulations for the control of the traffic thereon. Appellants admitted in their testimony that they could not profitably operate the restaurant with only nine parking spaces for the use of their customers, and that it was usual and

customary for many of their customers to park their automobiles in other parking areas in the shopping center.

As a practical matter, the right to use the area not covered by the building was not materially changed by the failure of the 1958 and 1960 leases to include that area as part of the leased premises. Appellants and their customers had as much right to the use of the parking area under the 1960 lease as they did under the 1950 lease, with the exception of the three parking spaces eliminated by the construction of the new building. Appellants did not have the right under either lease to appropriate the parking area to their own exclusive use or that of their customers, nor to prohibit the use thereof by customers or employees of neighboring businesses. The area in question was not a separate parking lot for the exclusive use of appellants and their customers, but formed a portion of the parking area of the entire shopping center.

■ The appellees were, successively, owners of that portion of Tract C not covered by the building and had the right to make such use of it as would give it its highest and best use. Appellants' lease did not guarantee to them that their building would always be on a corner or that any specified number of parking spaces would be available to them and their customers. Therefore, appellants could not base their claim of eviction on the doing of an act by appellees which they had a perfect legal right to do and which breached no duty owing to appellants. Sherrer v. Sparks, Tex.Civ.App., 78 S.W.2d 1035, no wr. hist.

■ Appellants also contend that the court erred in holding as a matter of law that they were not entitled to reformation of the lease because of fraud, accident and mutual mistake and in refusing to submit several requested special issues requested in connection with such contention. They rely upon the rule of law thus expressed in Automobile Ins. Co. of Hartford, Conn. v. United Electric Serv. Co., Tex. Civ.App., 275 S.W.2d 833, 839:

"A court of equity will reform written instruments either where there is a mutual mistake or where there has been a mistake of one party accompanied by fraud or inequitable conduct of the other party."

While there was testimony that the appellants were mistaken in thinking that the 1960 lease covered the entire Tract C, there is no evidence that any of the appellees made this mistake; hence, there was no mutual mistake.

"The settled rule of law in this state is that to reform a written contract for mutual mistake the evidence must be clear, satisfactory, and convincing. And as to whether a given state of facts in a case of this character satisfies this high standard of the law is a question of law to be determined by the court." Reliance Ins. Co. v. Pruitt, Tex.Civ.App., 94 S.W.2d 833, 836, wr. dism.

■ Moreover, we find no evidence in the record to establish even prima facie that any of the appellees was guilty of fraud or inequitable conduct in connection with the execution of either the 1958 lease or the 1960 lease. Appellants contend that when S. J. Bifano noticed the difference in the descriptions in the 1950 and the 1960 leases, and asked Hill to explain the difference, and Hill told him that there were no differences in the leases, this was a fraudulent misrepresentation inducing execution of the 1960 lease. We do not agree with appellants. It appears without dispute that there was nothing to prevent Bifano from reading the lease or having it read to him or examined by his attorney; and under those circumstances he must be charged with its stipulations and terms and is not justified in relying on what the other party to the contract said about it. Since both parties had equal means of knowing what property the 1960 lease covered, and no artifice or fraud was employed to prevent Bifano from making his own examination and arriving at his own

conclusion, Hill's statement must be regarded as a mere expression of opinion, and not a misrepresentation of a material fact upon which Bifano was legally entitled to rely. Guitar Trust Estate v. Boyd, Tex.Civ.App., 120 S.W.2d 914, 918, no wr. hist.; Whitsel v. Hoover, Tex.Civ. App., 120 S.W.2d 930, wr. dism.

The appellants also argue that the 1960 lease was ambiguous and should be construed by the court to include all of Tract C, and that the court erred in refusing to do so. They point out that, not only did both of the Bifanos testify that they thought the 1960 lease covered the same land as the 1950 lease, but both Hill in his oral testimony and his attorney in the pleadings stated that the 1960 lease purported to cover *a building* of 7,051 square feet, all of which is said to evidence such confusion as to require a holding of ambiguity. They also argue that the provision in the lease for the strip south of the building to be kept open as a vehicular traffic-way, referring as it does to "boundary lines", is at least some evidence of an intention to include the entire Tract C, since the term "boundary lines" is never applied to the lease or sale of a building, but only to the sale or lease of land; also, that the obligation therein of the tenant to keep the traffic-ways open and unimpeded is meaningless if the area in question is not covered by the lease, since a tenant leasing only a building has no rights or obligations outside of the building. We do not agree with appellants. In determining the ambiguity *vel non* of a writing, we must be guided by the language of the instrument itself, not by confusion which the interested parties or their attorneys may have experienced, our duty being to ascertain the intention of the parties, if possible, by the language contained in the contract "in the sense in which the language is ordinarily used." Western Indemnity Co. v. Southern Surety Co., Tex.Com.App., 1920, 223 S.W. 179, 181.

"Parties to a contract are bound by its plain terms and their intentions are to be ascertained from the language of the contract itself and not from what they supposed it to contain." Magnolia Petroleum Co. v. Storm, Tex.Civ.App., 239 S.W.2d 437, 440, wr. ref. n. r. e.

The parties to a contract cannot prove a construction thereof contrary to its plain meaning, Shropshire v. Commerce Farm Credit Co., 120 Tex. 400, 30 S.W.2d 282, 39 S.W.2d 11, 84 A.L.R. 1269, and an unambiguous contract cannot be interpreted by the parties to prove a construction contrary to its plain terms, Ranger Cisco Oil Co. v. Consolidated Oil Co. of Texas, Tex.Civ.App., 239 S.W. 648, wr. dism.

While it is often said that the courts will ordinarily give a contract the construction placed thereon by the parties, this rule does not apply to contracts which are free from ambiguity. El Paso & S. W. R. Co. v. Eichel & Weikel, Tex.Civ. App., 130 S.W. 922, wr. ref. We hold that the lease in question is unambiguous, and that the trial court correctly refused to construe it to have a meaning other than that expressed by its plain terms.

Appellants' first fifteen points of error are concerned with their contention of actual eviction. What we have said above makes it clear, we think, that no such actual eviction occurred. Accordingly, these points are overruled.

Points of error sixteen through twenty-eight are concerned with appellants' claim that the findings of the jury in response to Special Issues Nos. 1 through 6 establish the necessary elements of a constructive eviction, as set forth in Stillman v. Youmans, Tex.Civ.App., 266 S.W.2d 913, no wr. hist., and Richker v. Georgandis, Tex. Civ.App., 323 S.W.2d 90, 95, to-wit: (1) an intention on the part of the landlord that the tenant shall no longer enjoy the premises; (2) substantial interference by the landlord with the tenant's use and enjoyment of the premises; (3) causing permanent deprivation of the use and enjoy-

ment of the premises by the tenant; and (4) abandonment of the premises by the tenant within a reasonable time.

Appellees respond that there was no evidence or, alternatively, that there was insufficient evidence, to support these findings; also that the findings in response to Special Issues Nos. 15 and 16, that appellants' loss could have been compensated for in money damages without their removal from the premises, and that the construction of the new building was done with reasonable care, constituted a defense to the cause of action alleging constructive eviction. We see no point to be served by our engaging in a lengthy discussion of these contentions, for the answers of the jury to Special Issues Nos. 8 and 10 establish that appellants suffered no actual, and were entitled only to nominal exemplary, damages as a result of the alleged constructive eviction. The jury found (8) that the reasonable value of the leasehold on September 1, 1962 (about the time appellants abandoned the premises) was $465 per month, which was exactly the rent being paid under the lease; and (10) the sum of one dollar would reasonably compensate appellants for exemplary damages.

■ If the reasonable value of the leasehold did not exceed the amount appellants were obligated by the lease to pay for it, they have failed to prove that they were damaged by being evicted therefrom. 27 Tex.Jur., Landlord and Tenant, § 161, pp. 283–4; Wilson v. Moore, 57 Tex.Civ. App. 418, 122 S.W. 577, no wr. hist. Absent a right to actual damages, there can be no recovery of exemplary damages. 13 Tex.Jur., Damages, § 214, p. 376. Their points of error sixteen through twenty-eight are accordingly overruled.

By their twenty-ninth point of error appellants assail the instructed verdict given the appellees H. Leslie Hill and Econo Builders, Inc. These two appellees were the lessors, respectively, in the 1950 and 1960 leases, and appellants say that they cannot avoid their implied covenant of quiet enjoyment by simply conveying the legal title to others. Having already held that Gardens Development Company was not guilty of breaching this implied covenant, we must also hold that the prior owners were likewise guiltless. This point is therefore immaterial and is overruled.

■ By their thirtieth and thirty-first points of error appellants assail the findings of the jury in answer to Special Issues Nos. 8 and 9 as being against the great weight and preponderance of the evidence. Without detailing the testimony supporting these findings, we hold that there was sufficient evidence of probative force to support them and that the findings are not against the weight and preponderance of the evidence. In re King's Estate, 150 Tex. 662, 244 S.W. 2d 660. These points are overruled.

■ In their thirty-second point appellants complain that the answer of "$1.00" to Special Issue No. 10, inquiring as to exemplary damages, is inadequate as a matter of law. The point is neither briefed nor argued and may therefore be considered abandoned. Young v. Texas & Pacific Ry. Co., Tex.Civ.App., 347 S.W.2d 345, no wr. hist.; Fulton v. Abramson, Tex.Civ.App., 369 S.W.2d 815, no wr. hist. Nevertheless, we have considered the point and find no merit in it. No authority has been cited to support it and we have found none. Moreover, it is immaterial since no actual damages were found. The point is overruled.

■ The thirty-third point of error complains of the refusal of the court to submit a special issue similar in form to Special Issue No. 8, inquiring as to the value of the leasehold on September 1, 1962, except that in the requested issue the jury would have been asked to find such value of "the lease held by Plaintiffs, including the building, improvements, decorations, furnishings and fixtures constructed or placed on the premises by Plaintiffs." It does not appear from the record that the court was ever requested to submit

this issue. In the absence of such a request, the failure of the court to do so cannot be properly complained of here.

We have carefully examined all of appellants' points of error and find no merit in any of them. The judgment is therefore

Affirmed.

## ON APPELLANTS' MOTION FOR REHEARING

Appellants complain of our failure to notice their contention that, even if they were not entitled to damages for constructive eviction so far as the value of the leasehold was concerned, they were nevertheless entitled to recover as special damages the loss in value of their furniture and fixtures which were in the leased restaurant at the time of the alleged eviction. They argue that, the jury having found in response to Special Issue No. 9 that the reasonable market value of the furniture and fixtures sold by them on August 15, 1962 was $6,000, and since it had been stipulated at the trial that this personal property had been sold by them for $2,900, the difference of $3,100 definitely established the amount of their actual damages.

A careful review of the record discloses that this argument had not been presented to us until the filing of the motion for rehearing.

However, if it had been presented to us on original submission we would have overruled it, as we do now. We of course recognize the rule that a wrongfully evicted tenant may recover such damages as are shown to have been the foreseeable consequence of the eviction, Reavis v. Taylor, Tex.Civ.App., 162 S.W.2d 1030, 1034, wr. ref. w. m., but fail to see how the fact that appellants sold their property for $3,100 less than it was worth can be said to establish liability of the appellees for such loss.

The motion for rehearing is overruled.